O

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| LIVJO, INC. AND DIANA FITZGERALD,<br><br>Plaintiffs,<br><br>vs.<br><br>DECKERS OUTDOOR CORPORATION AND DOES 1-10,<br><br>Defendant. | CASE NO. CV 10-4557-JST (PLAx)<br><br>**ORDER (1) GRANTING PARTIAL SUMMARY JUDGMENT IN FAVOR OF DEFENDANT; AND (2) DENYING DEFENDANT'S MOTION TO STAY** |

1

## I. INTRODUCTION

Before the Court are a Motion for Summary Judgment (Doc. 62) and a Motion to Stay the Case (Doc. 76) filed by Defendant Deckers Outdoor Corporation ("Deckers"). The parties have filed their respective opposition and reply briefs. Having considered the papers and heard oral argument, the Court GRANTS IN PART Deckers' Motion for Summary Judgment and DENIES Deckers' Motion to Stay.

## II. BACKGROUND

In 2004, Plaintiff Diana FitzGerald ("FitzGerald") designed and began manufacturing her "Liv's Classic" crochet boot. Shortly thereafter she formed a company, Plaintiff Livjo, Inc. ("Livjo"), and licensed her design to Livjo. (FitzGerald Decl., Doc. 79-4, ¶ 2.) In January 2005, FitzGerald filed a patent application in her name for the boot design. Also in early 2005, she began marketing her boot as the Liv's "Classic." (Id. at ¶ 6.) In December 2006, Deckers, which had published its own line of UGG Classic boots in 2001 (Wilkes Decl., Doc. 64, Ex. 4), introduced a crochet boot, also called "Classic," which FitzGerald alleges was a "virtual identical copy" of the Liv's Classic boot. (FitzGerald Decl. at ¶ 8, 10.) On or about December 28, 2006, Livjo's counsel sent a letter to Deckers stating, in relevant part: "I am aware of the crochet boots being offered by Deckers under the UGG trademark," and "Livjo will shortly receive a Design Patent for its crochet boot." (Wilkes Decl., Ex. 13.) The letter also stated that "Livjo is interested in determining if Deckers is interested in either licensing or otherwise entering into [sic] business arrangement with Livjo." (Id.) In February 2008, U.S. Design Patent No. D561,983 ("the '983 patent") issued to FitzGerald. (Id. at ¶ 12.) After allegedly contacting Deckers to attempt to license the design and failing to secure a business arrangement, FitzGerald and Livjo initiated this suit in June 2010. (Pl.'s Opp'n, Doc. 79, at 4-5.)

In their Complaint, Livjo and Fitzgerald (collectively, "Plaintiffs") asserted two claims against Deckers: (1) infringement of the '983 patent, and (2) unfair competition under the

Lanham Act and state law. (Compl., Doc. 1, at 9-11.) In its Motion for Summary Judgment, Deckers argues that (1) the '983 patent is invalid as obvious; (2) Plaintiffs' infringement claims are barred by the doctrine of waiver; (3) Plaintiffs cannot recover damages that pre-date the filing of this lawsuit or, alternatively, cannot recover damages that pre-date the issuance of the patent; and (4) Plaintiffs cannot recover for unfair competition under the Lanham Act or state law. For the reasons stated below, the Court agrees that summary judgment is appropriate as to damages that pre-date the issuance of the patent and as to the unfair competition claims and grants summary judgment as to those issues.

### III.  MOTION FOR SUMMARY JUDGMENT LEGAL STANDARD

In deciding a summary judgment motion, a court must view the evidence in the light most favorable to the non-moving party and draw all justifiable inferences in its favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the initial burden of demonstrating the absence of a genuine issue of fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the moving party meets its initial responsibility, the burden then shifts to the opposing party to establish that a genuine issue as to any material fact exists. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). A factual issue is "genuine" when there is sufficient evidence such that a reasonable trier of fact could resolve the issue in the non-movant's favor, and an issue is "material" when its resolution might affect the outcome of the suit under the governing law. *Anderson*, 477 U.S. at 248.

### IV. '983 PATENT INFRINGEMENT CLAIM

Defendant makes three arguments with regard to Plaintiffs' patent infringement claim: (1) Plaintiffs waived their patent infringement claims by their conduct; (2) the '983 patent is invalid as obvious; and (3) Plaintiffs' damages are limited as a matter of law to those damages arising after the filing of the complaint in this case or, alternatively, after the issuance of the patent.

#### A. Waiver

Deckers argues that Plaintiffs' statements prior to filing the Complaint constituted a waiver of her right to enforce her patent, and that, accordingly, her patent infringement claims are barred. This argument lacks merit.

Specifically, Deckers recites the general principle that "waiver arises from the intentional relinquishment of a known right [or from] acts so inconsistent with an intent to enforce the right as to induce a reasonable belief that such right has been relinquished." (Def.'s MPA SJ at 9.) The Court need not determine the finer contours of that principle because Deckers fails to point to any conduct by Plaintiffs showing either intentional relinquishment or acts inconsistent with an intent to enforce the '983 patent rights. At most, the conduct identified reflects that FitzGerald initially made it clear that she preferred a business solution involving royalties over litigation.

#### B. Validity of the '983 Patent

Under 35 U.S.C. § 282, "an issued patent is presumed valid." *KSR Int'l Co. v. Teleflex, Inc.*, 550 U.S. 398, 412 (2007). Accordingly, "a moving party seeking to invalidate a patent at summary judgment must submit such clear and convincing facts of underlying invalidity that no reasonably jury could find otherwise." *SRAM Corp. v. AD-II Eng'g, Inc.*, 465 F.3d 1351, 1357 (Fed. Cir. 2006). In this case, therefore, Defendant must show clear and convincing evidence of the obviousness of Plaintiffs' '983 patent.

Design patents, like utility patents, must "meet the substantive criteria of patentability, including non-obviousness in accordance with the law of 35 U.S.C. § 103."

*L.A. Gear v. Thom McAn Shoe Co.*, 988 F.2d 1117, 1124 (Fed. Cir. 1993).  "In the design patent context, the ultimate inquiry under section 103 is whether the claimed design would have been obvious to a designer of ordinary skill who designs articles of the type involved. More specifically, the inquiry is whether one of ordinary skill would have combined the teachings of the prior art to create the same visual appearance as the claimed design." *Durling v. Spectrum Furniture Co.*, 101 F.3d 100, 103 (Fed. Cir. 1996) (internal citations and quotations omitted.).

The first step in the obviousness analysis for design patents is to identify a primary reference, "the design characteristics of which are basically the same as the claimed design . . . ." *In re Rosen*, 673 F.3d 388, 391 (Fed. Cir. 1982).  If Defendant points to a satisfactory primary reference, then other references in the prior art may be considered.  *In re Borden*, 90 F.3d 1570, 1574-75 (Fed. Cir. 1996).  "In order for secondary references to be considered, however, there must be some suggestion in the prior art to modify the basic design with features from the secondary references." *Id.* at 1574.  In other words, "the teachings of prior art designs may be combined only when the designs are so related that the appearance of certain ornamental features in one would suggest the application of those features to the other."  *Id.* at 1575 (internal citations and quotations omitted).

### i. Primary Reference

Defendant argues that its 2001 UGG Classic ("2001 UGG") boot serves as a primary reference for Plaintiffs' '983 patent.[1]  (Def.'s MPA SJ, Doc. 63, at 4.)   The Court, then, must "(1) discern the correct visual impression created by the ['983 patent] as a whole; and (2) determine whether [the 2001 UGG] . . . creates basically the same visual impression." *Durling*, 101 F.3d at 103.  While this analysis requires the Court to explain its reasoning by describing the visual impressions in words, the focus remains on the visual impression as a whole, not individual design concepts.  *Id.* at 103-04.

---

[1] Plaintiffs argue that the UGG catalog is not a "printed publication" under 35 U.S.C. § 102. (Pl.'s Opp'n. at 8-10).  The Court finds that it need not address this issue on summary judgment.

The visual appearance of the 2001 UGG is that of a puffy boot with exposed seaming running the length of the boot and around the circumference of the ankle. The sole of the boot has a zig-zag patterned tread with smooth sections at the toe, mid-foot, and heel. Moreover, the 2001 UGG appears smooth and suede-like as a result of the exposed sheepskin visible on the outside of the boot. (Wilkes Decl., Ex. 4, at 3.) *See also* Appendix A.

The visual appearance of '983 patent is also that of a boot with exposed seaming running the length of the boot and the circumference of the ankle. The rubber sole has a zig-zag patterned tread with three smooth sections at the toe, mid-foot, and heel. However, a dominant feature of the '983 patent is that it does not appear smooth, but rather crochet-textured with a concentric-oval pattern on the top of the foot. As a result of the crochet, it appears sleeker and less puffy than the 2001 UGG. (Id., Ex. 1.) While the 2001 UGG and the '983 patent both have the appearance of winter outerwear in boot form, the '983 patent appears to be a sweater for the foot, while 2001 UGG looks like a sheepskin coat-turned-shoe. *See In re Rosen*, 673 F.2d at 391 (finding that while two designs were both of contemporary styling, they created a different overall appearance and aesthetic appeal.) Particularly in the crowded design field of women's footwear, the difference between the visual impression of the 2001 UGG and the '983 patent is significant. *See In re Harvey*, 12 F.3d 1061, 1064 (Fed. Cir. 1993) (considering the crowdedness of the ornamental vase design field in the obviousness analysis.) Thus, the Court concludes that Defendant has not met its burden of showing that the '983 patent and the 2001 UGG create "basically the same" visual impression.

### ii. Secondary References

Because the Defendant has failed to identify a proper primary reference, the Court cannot consider secondary references. Nonetheless, even if the 2001 UGG were a proper reference, the secondary references identified by Defendant are not "so related that the application of certain ornamental features in one reference would have suggested

1 application of those features to another." *In re Sung Nam Cho*, 813 F.2d 378, 382 (Fed.
2 Cir. 1987) (internal citations omitted). Defendant argues that U.S. Patent No. 3,925,912 to
3 Martineau ("the Martineau '912 patent"), U.S. Patent No. 3,067,532 to Peterson ("the
4 Peterson '532 patent"), U.S. Patent No. 146,700 to Cohn ("the Cohn '700 patent"), and
5 *Footwear: Shoes and Socks You Can Make Yourself* by Ruth J. Katz ("the Katz reference")
6 all serve as secondary references. (Def.'s MPA SJ at 4.) The Martineau '912 patent and
7 Peterson '532 patents are both utility patents, not design patents, and therefore do not
8 suggest ornamental features at all. (Wilkes Decl., Ex. 5-6.)

9       While the Cohn '700 patent, the Katz reference, and the 2001 UGG may include
10 each and every one of the design *elements* of the '983 patent, as Defendant argues, "a
11 finding of obviousness cannot be based on selecting features from the prior art and
12 assembling them to form an article similar in appearance to the claimed design." *In re
13 Borden*, 90 F.3d at 1574 (internal citations omitted). The Cohn '700 patent is for a slipper,
14 not a boot, and the Katz reference shows a leg warmer, also not a boot. Defendant has not
15 presented any evidence, other than that every *element* can be found in the prior art, why it
16 would be obvious to one of ordinary skill in the art to combine these references with the
17 2001 UGG. (Def.'s MPA SJ at 8.) Even if such a combination seems obvious now,
18 "obviousness is not determined as if the designer had hindsight knowledge of the patented
19 design." *L.A. Gear*, 988 F.2d at 1124.

20       **iii.**    **Secondary Considerations of Non-Obviousness**

21       Plaintiff presents evidence of secondary considerations suggesting non-obviousness.
22 Commercial success and unpermitted copying, for example, can provide evidence that a
23 design was not obvious. *Glaverbal Societe Anonyme v. Northlake Mktg. & Supply*, 45
24 F.3d 1550, 1555 (Fed. Cir. 1995). In this case, sales of Plaintiffs' crochet boots were over
25 $600,000 in 2005, and nearly $1 million in 2006. (FitzGerald Decl. at ¶ 5.) Moreover,
26 while Deckers disputes – on grounds that are not clear – Plaintiffs' claim that Deckers
27 copied the Liv's Classic crochet boot (Def. Reply, Doc. 88, at 22), it does not dispute that
28

7

1 after the introduction to the marketplace of the Liv's boot, Deckers introduced a virtually
2 identical boot.  Plaintiffs' evidence of secondary considerations, even if purportedly
3 controverted by Deckers, supports this Court's conclusion that Deckers has not met its
4 burden of showing that the '983 patent is obvious.  (FitzGeraldn Decl. at ¶ 8.)

6    C.   Limitation on Pre-Suit Damages
7    A patentee's damages in an infringement suit are limited to those arising from acts
8 committed by the alleged infringer after it received notice of the alleged infringement from
9 the patentee.  35 U.S.C. § 287(a).  Notice may take the form of actual notice or
10 constructive notice (marking the product with the patent number).  Id.  Defendant argues
11 that Plaintiffs did not give actual or constructive notice, and therefore Plaintiffs' damages
12 must be limited in any case to post-suit damages.  (Def.'s MPA SJ at 12-16.)
13    i.   **Actual Notice**
14    The Federal Circuit stated in *Amsted Industries* that actual "notice must be an
15 affirmative act on the part of the patentee which informs the defendant of his
16 infringement."  *Amsted Indus., Inc. v. Buckeye Steel Castings, Co.*, 24 F.3d 178, 187.
17 Specifically, actual notice must include "identity of the patent and the activity that is
18 believed to be an infringement, accompanied by a proposal to abate the infringement,
19 whether by license or otherwise."  *SRI Int'l., Inc. v. Advanced Tech. Labs., Inc.*, 127 F.3d
20 1462, 1470 (Fed. Cir. 1997).  Notably, actual notice does not require an "unqualified
21 charge of infringement."  *Gart v. Logitech, Inc.*, 254 F.3d 1334, 1346 (Fed. Cir. 2001)
22 (internal citations and quotations omitted).  Accordingly, an offer to license does not
23 negate the "specific charge of infringement" requirement because "[t]he whole point of
24 offering a license is to insulate a licensee from infringement charges by the licensor."  *Id.*
25 (internal citations omitted).
26    In this case, there is evidence that Defendant received a letter dated December 28, 2006
27 ("the 2006 letter") from Plaintiff Livjo's counsel indicating that (1) Livjo would soon

1  receive a patent for its crochet boot; (2) Deckers offered a crochet boot under the UGG
2  trademark; and (3) Livjo was interested "in determining if Deckers is interested in either
3  licensing or otherwise entering into [sic] business arrangement with Livjo."  (Wilkes Decl.,
4  Ex. 13.)  Livjo's counsel then received a letter from Defendant's counsel requesting a copy
5  of "your client's pending design application . . . .  If possible, a complete copy of the file
6  history would also be helpful in our evaluation."  (FitzGerald Decl., Ex. C.)  In response,
7  Plaintiffs' counsel "sent to Deckers' counsel a copy of the patent application and related
8  materials in the patent office file.  On March 28, 2007, Deckers' counsel notified
9  Plaintiffs' counsel that it had "reviewed [Plaintiffs'] pending United States design patent"
10 and "conclude[d] that there is no need or benefit in taking a license."  (Id. at Ex. D.)  After
11 the patent issued in February 2008, FitzGerald then told Stephanie Cucurullo, in-house
12 counsel for Deckers, "that the patent had now issued and that [she] wanted to explore a
13 business solution."  (Id. at ¶ 12.)

14  As a preliminary matter, notice provided by someone associated with the patentee
15 rather than the patentee herself is generally invalid.  *Lans v. Digital Equip. Corp*., 252 F.3d
16 1320, 1327 (Fed. Cir. 2001).  However, "when the information printed on the patent is
17 correct, it is enough to put an accused on notice of the patentee's identity."  *U.S. Phillips*
18 *Corp. v. Iwasaki Elec. Co.*, 505 F.3d 1371, 1375 (Fed. Cir. 2007).  Here, there is evidence
19 that Defendant received a copy of the design patent application, and there is no evidence
20 that the application incorrectly identified the patent applicant.  Therefore, the fact that the
21 2006 letter misidentified Livjo as the patent applicant does not negate that communication.
22 Furthermore, FitzGerald herself contacted Deckers after the patent issued.

23  The Court recognizes that the 2006 letter alone cannot suffice as actual notice because
24 Plaintiff sent it before the patent issued.  *See SRI Int'l*, 127 F.3d at 1470 ("The requirement
25 of actual notice under § 287(a) is designed to assure that the recipient knew of the adverse
26 patent during the period in which liability accrues.")  *See also Civix-DDI v. Cellco P'ship*,
27 387 F. Supp. 2d 869, 900 (N.D. Ill. 2005) (noting persuasively that a letter sent before a
28

patent issues cannot "communicate the specific charge of infringement required by the Federal Circuit" because the patentee does not yet have enforceable rights) (internal citations omitted). However, FitzGerald's subsequent contact with Deckers post-issuance extended this course of communication into the period during which liability would accrue.

The Court concludes that Plaintiffs' communications to Defendant raise a question of fact as to whether Defendant had actual notice. Through this series of letters and conversations, FitzGerald, Livjo and Plaintiff's counsel identified the infringing product (Deckers' crochet boot) and the identity of the pending, and subsequently issued, patent. Furthermore, Deckers' counsel responded to the 2006 letter with a request for a copy of the pending patent application, which Plaintiffs provided. Deckers' counsel responded to its review of the patent application by notifying Plaintiffs that it concluded that no license was needed. Therefore, a reasonable jury could determine that the 2006 letter created a "suggestion that a license under the patent may be needed," which is sufficient to constitute a specific charge of infringement. *Gart*, 254 F.3d at 1346.

Moreover, Deckers' response to the 2006 letter raises an issue of fact as to whether Plaintiffs issued a specific charge of infringement in the 2006 letter. "[T]he notice requirement of § 287 is satisfied where the infringer acknowledges a specific communication to be a notice of infringement." *Wokas v. Dresser Indus., Inc.*, 978 F.Supp. 839, 846 (N.D. Ind. 1997) (internal citations omitted). Deckers' March 28, 2007 letter stating that Deckers' counsel had reviewed the patent and concluded that there was no need or benefit in taking a license could be understood as an acknowledgement that the 2006 letter included a specific charge of infringement. In other words, a logical response to a charge of infringement is to review the patent at issue and determine whether a license is needed. Because it appears that this is exactly what Defendant did, there is an issue of fact as to whether Plaintiff provided actual notice of infringement.

### ii. **Constructive Notice**

"In order to satisfy the constructive notice provision of the marking statute, [the patent owner] must have shown that substantially all of the [patent owner's products] being distributed were marked, and that once marking was begun, the marking was substantially consistent and continuous." *Nike, Inc. v. Wal-Mart Stores, Inc.*, 138 F.3d 1437, 1446 (Fed. Cir. 1998). The patentee must show by a preponderance of the evidence that it has provided constructive notice through marking. *Id*.

The only evidence Plaintiffs have submitted of marking is the FitzGerald declaration, in which she states that (1) promotional literature indicating a "patent pending," (2) all crochet boots manufactured after the patent issued "were marked with a clear sticker placed on the sole of each boot that said 'Pat. No. D561983'." (FitzGerald Decl. at ¶ 19.) However, the declaration itself shows that these statements are not based on personal knowledge and therefore cannot raise a genuine issue of material fact. Rather, FitzGerald bases her statements on her "confiden[ce]" that her instructions to the manufacturer regarding marking were followed. To the contrary, Deckers has introduced evidence that Livjo crochet boots were, in fact, not marked. (Wilkes Decl., Ex. 10-11.) Therefore, the Court concludes that no reasonable jury could find that Plaintiffs complied with §287(a) by providing constructive notice through marking their boots.

D. <u>Limitation on Pre-Issuance Damages</u>

As a matter of law, Plaintiff is not entitled to damages as a result of any of Defendant's allegedly infringing conduct that occurred prior to the issuance of the '983 patent on February 19, 2008. 35 U.S.C. §154(d) grants a patentee provisional rights "during the period beginning on the date of the publication of the application for such patent under section 122(b)." Under § 122(b), however, design patent applications are not published by the USPTO. 35 U.S.C. § 122(b)(2)(A)(iv). Plaintiffs argue that whether or not the USPTO published the application, Defendant had actual notice of the application.

11

However, §154(d) requires that the defendant "had actual notice of the *published* patent application," not just actual notice of the application. 35 U.S.C. §154(d) (emphasis added). Therefore, Plaintiff has no right to royalties for Defendant's conduct during the time the application was pending.

### V. TRADEMARK AND DERIVATIVE STATE LAW CLAIMS

Section 43(a) of the Lanham Act creates, in essence, a federal law of unfair competition. *Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 783 n.18 (1992). Under the Lanham Act:

> Any person who, on or in connection with any goods or services . . . uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, which—(A) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person . . . shall be liable in a civil action by any person who believes that he or she is likely to be damaged by such an act.

15 U.S.C. § 1125(a).

Both trademarks and trade dress are protected under the Lanham Act. *See Int'l Jensen, Inc. v. Metrosound U.S.A., Inc.*, 4 F.3d 819, 822 (9th Cir. 1993). "Trademarks represent 'a limited property right in a particular word, phrase, or symbol.'" *Aurora World, Inc. v. Ty, Inc.*, 719 F. Supp. 2d 1115, 1140-41 (C.D. Cal. 2009) (quoting *New Kids on the Block v. News Am. Publ'g, Inc.*, 971 F.2d 302, 306 (9th Cir. 1992)). On the other hand, "trade dress refers to the total image of a product and may include features such as size, shape, color, color combinations, texture or graphics." *Int'l Jensen*, 4 F.3d at 822 (internal quotations

12

and citations omitted). Therefore, Plaintiffs' trademark claim may be based on either a trademark right in the word "classic," or a trade dress right in the design of the "Livs Classic" boot or a combination of the name "classic" and the product design.

### A. Trademark Right in "Classic"

A trade name claim under § 43(a) requires two elements: (1) a protectable interest in the trade name and (2) the likelihood of confusion because of defendant's use. *Bazaar Del Mundo, Inc.*, 448 F.3d 1118, 1124 (9th Cir. 2006). As to the first prong, "[t]o acquire ownership of a trademark it is not enough to have invented the mark first or even to have registered it first; the party claiming ownership must have been the first to actually use the mark in the sale of goods or services." *Sengoku Works Ltd. v. RMC Int'l., Ltd.*, 96 F.3d 1217, 1219 (9th Cir. 1996). There is no dispute, however, that Defendant was using "Classic" in connection with its boots prior to Livjo's founding in November, 2004. (Wilkes Decl., Ex. 3, at 45:21-48:3.) Moreover, Plaintiffs appear to have abandoned their argument that they have a trademark right in the word "classic" alone. (Pl.'s Opp'n. at 21-25.) Therefore, based on the undisputed facts, Plaintiffs do not have a trademark right in the name "Classic."

### B. Trade Dress Right in Design of Liv's Classic Boot

Section 43(a) trade dress claims require three elements: (1) distinctiveness, (2) non-functionality, and (3) likelihood to cause confusion. *Wal-Mart Stores v. Samara Bros.*, 529 U.S. 205, 210 (2000). As discussed below, because Plaintiffs cannot show that the design of the Liv's Classic is distinctive, Plaintiffs cannot show a trade dress right in the product design alone.

Trade dress can be distinctive if it is inherently distinctive or it if has developed secondary meaning. *Id.* at 210-11. However, "design, like color, is not inherently distinctive" so secondary meaning must be proven. *Id.* at 212. The Supreme Court noted

that the secondary meaning threshold is appropriate because of the availability of protections afforded by design patents. *Id.* at 214. Secondary meaning refers to "the mental association by a substantial segment of consumers and potential consumers 'between the alleged mark and a single source of the product.'" *Levi Strauss & Co. v. Blue Bell, Inc.*, 778 F.2d 1352, 1354 (9th Cir. 1985) (quoting 1 J. McCarthy, *Trademarks and Unfair Competition*, §§ 15:2 at 659 & 15:11(B) at 686 (2d ed. 1984)). "A product's trade dress attains secondary meaning when the purchasing public associates the dress with a single producer or source rather than just the product itself." *First Brands Corp. v. Fred Meyer, Inc.*, 809 F.2d 1378, 1383 (9th Cir. 1987).

The Ninth Circuit has identified four factors to be used to determine if secondary meaning has been achieved: "(1) whether actual purchasers of the product bearing the claimed trademark associate the trademark with the producer, (2) the degree and manner of advertising under the claimed trademark, (3) the length and manner of use of the claimed trademark, and (4) whether use of the claimed trademark has been exclusive." *Comm. for Idaho's High Desert, Inc. v. Yost*, 92 F.3d 814, 822 (9th Cir. 1996) (internal quotations and citations omitted). Additionally, secondary meaning must be acquired by the time the alleged infringer begins using the mark at issue. *See Levi Strauss & Co.*, 778 F.2d at 1358. Therefore, Plaintiffs must establish that their product design had acquired secondary meaning between December 2004, when Plaintiffs first introduced their boot, and December 2006, when Defendant first introduced its crochet boot. (FitzGerald Decl., at ¶¶ 3, 8.)

The only evidence before the Court as to secondary meaning is Plaintiffs' advertising and promotional efforts. Plaintiffs displayed the "Livs Classic" at numerous trade shows and received media attention in magazines such as *People*. Plaintiffs also placed one ad in 2005, and three ads in 2006. The "Livs Classic" was also selected as a celebrity gift at the 2006 Sundance Film Festival. (Pl.'s Genuine Issues, Doc. 80, at 38.) However, Plaintiffs must prove that these efforts were effective, through survey evidence or direct consumer

testimony. *Art Attacks Ink v. MGA Entm't, Inc.*, 581 F.3d 1138, 1146 (9th Cir. 2009). Plaintiffs have submitted no such evidence.

Alternatively, Plaintiffs could show secondary meaning through a combination of significant advertising and a substantial period of exclusive use. *Id.* While there is no minimum required length of time, two years falls short of the "substantial" period of time generally found to give rise to secondary meaning. *See id.* Therefore, the Court concludes that no reasonable jury could find that Plaintiffs' product design had acquired secondary meaning by December 2006.

### C. Trade Dress Right in Combination Name/Design

To prove a combination right in the name and product design, Plaintiffs would have to provide evidence that the name and product design were presented to customers simultaneously so as to form "the total image of a product." *Int'l Jensen*, 4 F.3d at 882 (internal citations and quotations omitted). While the Court might surmise that the ads Plaintiffs placed in magazines, for example, included both a picture of the boot as well as the name, Plaintiffs have submitted no such evidence. Therefore, the Court concludes that Defendant is entitled to summary judgment on Plaintiffs' claim under § 43.

### D. California Business and Professional Code § 17200 and Common Law

Plaintiffs' assertion of claims under California Business and Professions Code § 17200 and common law are derivative of Plaintiffs' Lanham Act claim. Because the Court concludes that Defendant is entitled to judgment as a matter of law on the claim for relief under § 43, the Court also concludes that Defendant is entitled to judgment as a matter of law for claims under § 17200 and common law. *See Cleary v. News Corp.*, 30 F.3d 1255, 1263 (9th Cir. 1994) ("This Circuit has consistently held that state common law claims of unfair competition and actions pursuant to California Business and Professions Code § 17200 are 'substantially congruent' to claims made under the Lanham Act."); *See also*

*RDF Media Ltd. v. Fox Broad. Co.*, 372 F. Supp. 2d 556, 565 (C.D. Cal. 2005) ("Given that the Court has determined that Defendants are not subject to liability under the Lanham Act, Plaintiffs' unfair competition claim premised upon the Lanham Act violations must fail.").

## VI.  MOTION TO STAY

On July 19, 2011, Defendant requested the United States Patent and Trademark Office ("USPTO") reexamine the '983 patent. (Def. MPA Stay, Doc. 76-1, at 1.) Based on this request for reexamination, Deckers moves to stay this action. The Court denies the motion.

"Any person at any time may file a request for reexamination by the [USPTO] of any claim of a patent on the basis of any prior art," 35 U.S.C. § 302, and "[a]ny third-party requester at any time may file a request for *inter partes* reexamination by the [USPTO] of a patent on the basis of any prior art . . . ." 35 U.S.C. § 311(a). A district court has the discretion to stay judicial proceedings pending reexamination of a patent. *See Ethicon, Inc. v. Quigg*, 849 F.2d 1422, 1426-27 (Fed. Cir. 1988). Courts consider three factors in determining whether to grant a stay pending reexamination: "(1) whether discovery is complete and whether a trial date has been set; (2) whether a stay will simplify the issues in question and trial of the case; and (3) whether a stay would unduly prejudice or present a clear tactical disadvantage to the non-moving party." *Telemac Corp. v. Teledigital, Inc.*, 450 F.Supp.2d 1107, 1111 (N.D. Cal. 2006).

### A.  Stage of the Proceedings

This factor, whether discovery is complete and whether a trial date has been set, weighs against granting a stay. Defendant implicitly concedes that the parties are at a late stage of proceedings. (Def.'s MPA Stay at 7.) Plaintiff filed the Complaint in this case in June 2010, but Defendant did not request a stay until over a year later, at the same time it asked this Court to rule on a summary judgment motion. Furthermore, this request came two

16

weeks after the discovery cut-off of August 1, 2011, and a trial is set for November 1, 2011.  *See Telemac Corp.*, 450 F.Supp.2d at 1111.

B.  <u>Simplification of the Issues</u>

This case is poised for trial.  After considering parties' briefs and oral argument on Defendant's summary judgment motion, this Court is familiar with the patent at issue.  As a result, the Court finds it unnecessary to wait for the USPTO's guidance upon reexamination.  Furthermore, a *Markman* hearing, for which the USPTO's guidance may be helpful, is not required in a design patent case.  *Egyptian Goddess, Inc. v. Swisa*, 543 F.3d 665 (Fed. Cir. 2008).  On the other side of the equation, there is still a possibility that the USPTO will not grant Defendant's request for re-examination, and an even greater chance that USPTO's eventual guidance will merely reiterate what this Court has already found through disposition of Defendant's summary judgment motion.  Given the Court's satisfaction with its understanding of the patent at issue and the small potential for the USPTO's guidance to obviate the need for a trial, this second factor weighs against a stay.

C.  <u>Effect on the Parties</u>

Plaintiffs argue that Defendant's motion for stay is an "attempt to achieve delay for the sake of delay."  (Pl.'s Opp'n. to Stay, Doc. 81, at 5.)  The Court agrees.  "Parties should not be permitted to abuse the [reexamination] process by applying for reexamination after protracted, expensive discovery or trial preparation."  *Freeman v. Minnesota Mining and Mfg. Co.*, 661 F.Supp. 886, 888 (D. Del. 1987) (citations omitted).  Here, Defendant's request for reexamination and motion to stay so late in the proceedings appears to be nothing other than a "mere dilatory tactic."  *Id.*  Nonetheless, Plaintiffs do not allege that they will suffer undue prejudice or a clear tactical disadvantage as a result of a stay.  (Pl.'s Opp'n. to Stay at 5.)  Therefore, this factor weighs only slightly against a stay.  Together, however, the factors clearly weigh against granting Defendant's motion to stay.

## VII. CONCLUSION

For the foregoing reasons, the Court GRANTS Defendant's Motion for Partial Summary Judgment as to (1) pre-issuance damages for infringement of the '983 patent; (2) pre-suit damages based on constructive notice (however, Plaintiff has raised a genuine issue of material fact as to actual notice);  and (3) Plaintiffs' Lanham Act and state unfair competition claims.  The Court DENIES Defendant's Motion to Stay.

DATED: September 27, 2011

                                      JOSEPHINE STATON TUCKER
                                      JOSEPHINE STATON TUCKER
                                      UNITED STATES DISTRICT JUDGE

**APPENDIX A**



**UGG 2001 Classic**　　　**'983 Patent**